UNITED STATES *v.* SEATTLE BREWING & MALTING CO. (Nos. 263 and 264).[1]

1. SAMPLES FOR TESTING SELECTED BY THE GOVERNMENT.

Apart from any question of the right of the importer to challenge as unfair the quantity or condition of samples of merchandise selected by the Government for test purposes, where officials charged with the responsibility of assessing and collecting duties take such samples of an imported commodity as they deem necessary to insure a proper test of the goods in conformity to law and the regulations of the Treasury Department, no fraud being alleged, the Government will not be permitted here to challenge as unsatisfactory the quantity or condition of the samples so selected.

2. SAME—THESE SAMPLES MAY BE RELIED ON BY THE IMPORTER.

To sustain the burden of showing a collector's assessment erroneous, it is not incumbent on the importer to preserve samples of his importation for a possible future use in litigation; and he may rely, if he chooses to rely, on the sufficiency of the samples selected by the representatives of the Government.

3. BROKEN RICE—WHERE AN EXAMINATION DE NOVO AS TO THE PROPER RATE OF DUTY IS IMPOSSIBLE.

In the case at bar there may have been insufficient samples before the court below, thus making it difficult, if not impossible, to determine with precision just what proportion of the consignment of broken rice was dutiable at a higher rate and what at a lower rate, yet the court was able to reach and did reach a conclusion substantially correct, and its judgment is accordingly affirmed (United States *v.* Ranlett, 172 U. S., 133).

## United States Court of Customs Appeals, March 27, 1911.

TRANSFERRED from United States Circuit Court of Appeals, Ninth Circuit, Abstract 13152 (T. D. 27674) and Abstract 14032 (T. D. 27824); 175 Fed. Rep., 125, 128 (T. D. 30341).

[Affirmed.]

*D. Frank Lloyd,* Assistant Attorney General (*Frank L. Lawrence* on the brief), for the United States.

*Comstock & Washburn* (*Albert H. Washburn* of counsel) for appellee.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:

The Seattle Brewing & Malting Co. imported by the vessel *Hyson* at the port of Seattle, June 2, 1904, 1,689 bags of broken rice, containing approximately 370,000 pounds, commonly known as "brewers' rice," and by the vessel *Tremont* at the same port on the 9th day of August, 1904, 2,328 bags, containing approximately 490,000 pounds of the same kind of rice, all of which it is conceded was dutiable under paragraph 232 of the tariff act of 1897, the pertinent provisions of which are as follows:

232. Rice, cleaned, two cents per pound; uncleaned rice, or rice free of the outer hull and still having the inner cuticle on, one and one-fourth cents per pound; * * * rice broken which will pass through a sieve known commercially as number twelve wire sieve, one-fourth of one cent per pound. * * *

---

[1] Reported in T. D. 31454 (Treas. Dec., 592).

At the time these importations were made there was in force a regulation of the Treasury Department providing that the wire used to form the meshes of the No. 12 wire sieve mentioned in the quoted paragraph should be No. 24 brass wire, either Stubbs or Birmingham gauge (T. D. 22528, T. D. 22680). The diameter of this prescribed wire is 0.016 of an inch.

The *Hyson* importation was first assessed at one-fourth of a cent per pound, no test with any sieve apparently having been made by the collector or his subordinates, and the merchandise liquidated accordingly. Later and within some 60 or 90 days a Government examiner tested a sample of this importation with a sieve, and upon the basis of such test duty was assessed on $81\frac{1}{4}$ per cent thereof at the rate of 2 cents per pound and on $18\frac{3}{4}$ per cent thereof at one-fourth of a cent per pound, and reliquidation had accordingly. There is no direct evidence as to the gauge of the wire in the sieve used in making this test. A protest and appeal from this reliquidation was made on the 28th day of September, 1904.

A sample of the rice, weighing about 11 ounces and which was certified by the examiner as a representative sample of the rice, was sent with the papers in the case to the board. It appears that this sample was obtained in the following manner: About 40 bags of the importation were opened and a handful taken from each; the amount thus obtained was all put in a bag and mixed and from it the sample sent to the Board of General Appraisers was taken.

The board in its decision, dated December 29, 1906, stated that the importers had not introduced any evidence in support of their protest, and that a careful test made by the board of this sample showed that 24 per cent thereof passed through the standard No. 12 sieve in use in the appraisers' office at New York. The gauge of the wire of this sieve is not stated, but may be presumed to be that required by the regulations then in force.

The board held that this sample was inadequate to determine the proportion of broken rice in the importation. The importers in their protest, which was sworn to, claimed that this sample was not a sample of the rice covered by the importation, but was an entirely different grade and quality. The board, because of this claim and because of its finding that the sample was inadequate in amount, said in substance that it would hardly be justified in finding in favor of the importers that the difference between the amount passing through the sieve in New York and the amount assessed by the collector as broken rice, which would be $5\frac{1}{4}$ per cent (but is stated to be $3\frac{1}{4}$ per cent in the printed case), should be classified at the lower rate, and further, that as the case stood the findings of the customs officers had not been successfully assailed and overruled the protest.

The *Tremont* importation was assessed at the rate of 2 cents per pound. . The protest was filed September 2, 1904. It appears that one sample thereof was taken, composed of specimens from several places in the cargo, but from how many bags or what amount was taken the record does not show.

This sample was tested by the collector or his subordinates with a No. 12 sieve, the wire of which was 27 gauge. Under the regulations of the Treasury Department the sieve should have been composed of 24-gauge wire, as before stated. The 27-gauge wire is 0.006 inch less in diameter than the 24-gauge wire, and as a No. 12 sieve concededly contains 12 meshes or apertures to the inch, it is obvious that the mesh in the sieve used in testing the rice was larger than it ought to have been to comply with the regulations of the department, and equally obvious that this would result in a greater amount of rice passing through the sieve used in making the test than would have passed through it had the regulation sieve been used. The test as made resulted as follows: Seventy-six per cent of the sample passed through freely, and by shaking and rubbing the rice continuously until it seemed apparent that no more would go through the sieve, the total amount passing through was increased to 87 per cent of the sample tested. Notwithstanding this test, duty was assessed by the collector at 2 cents per pound, as before stated, upon the entire importation. The collector apparently made such assessment in good faith, relying upon what he deemed the controlling effect of certain court decisions. He states in his letter, transmitting the protest to the Board of General Appraisers, that he had since the liquidation been advised by the Secretary of the Treasury that only the rice which would not pass through the sieve should be held for the higher rate of duty.

With the papers in the case a sample of the importation was transmitted by the collector to the Board of General Appraisers, and it also appears that he sent another sample, by express, to the board, pursuant to the instructions of the Treasury Department, all in the latter part of 1904. Evidence was taken before the board. One of the samples sent to the board, as before stated, and which weighed a little less than a pound, was tested by the examiner of rice for the port of New York. He found that 33⅓ per cent of this sample would pass through the regulation sieve. The importers contended before the board that the samples were too small in order to determine therefrom the proper classification of the importation, with which contention the board agreed, and, there being no other evidence upon that question, the board held, in view of the rule that the burden was upon the importers by a fair preponderance of evidence to show what proportion of the rice was dutiable at the lower rate, that the protest must be overruled, although it said that "with some regret" it reached that conclusion.

Appeals in both cases were duly taken by the importers to the Circuit Court for the Western District of Washington, and the papers in the cases with the official exhibits were seasonably forwarded to the clerk of that court.

Such proceedings were had in each case in said circuit court that further evidence was taken by way of deposition, by both parties, at Seattle on the 20th day of March, 1909.   This evidence, so far as is material here, relates to an examination on the 17th day of March, 1909, of the official samples of these importations by three witnesses on behalf of the importers.   These witnesses testified that they tested the official samples in each of these cases by ascertaining what percentage thereof would pass through such a wire sieve as was prescribed by the said Treasury regulations and gave the results of such tests.

So far as the record discloses no witness on behalf of the Government tested these samples after the cases reached the circuit court, although no reason appears to exist why it could not have been done if deemed advisable.

The circuit court upon the evidence above referred to found that as to the *Hyson* shipment $43\frac{2}{11}$ per cent of the official sample passed through said regulation sieve, and thereupon adjudged that $43\frac{2}{11}$ per cent of that importation was dutiable at the rate of one-fourth of a cent per pound and the remainder at the rate of 2 cents per pound. That as to the *Tremont* shipment $47\frac{1}{3}$ per cent of the official sample passed through said regulation sieve, and thereupon adjudged that $47\frac{1}{3}$ per cent of that importation was dutiable at the rate of one-fourth of a cent per pound and the remainder at the rate of 2 cents per pound.

In the *Tremont* case the court, in part, said:

There is manifest injustice in the assessment of duty on the importation which is the subject of litigation in this case, so much so that the decision of the Board of General Appraisers overruling the importers' protest expresses regret.   *   *   *   At the time of entry the collector tested samples of the rice, using a No. 12 sieve made of No. 27 wire, 12 meshes to the inch, and by that test it was found that 76 per cent passed freely and that with persistent shaking and rubbing 87 per cent passed through the sieve.   The collector erroneously exacted duty on the entire importation at the higher rate   *   *   *   The collector transmitted a report of the test he had made and a sample of the rice which was tested at New York, using a No. 12 sieve made of No. 24 wire, which is the sieve prescribed by an order promulgated by the Secretary of the Treasury.   *   *   *   On that test $33\frac{1}{3}$ per cent of the sample passed through the sieve.   By its decision the board rejected the test made by the collector on the ground that the sieve used was not the sieve which the Secretary of the Treasury prescribed, and rejected the test made at New York on the ground that the sample was insufficient in quantity for an adequate test, and overruled the protest on the ground that the appellant had failed to prove affirmatively that the rate of 2 cents per pound was not applicable to the entire importation.   *   *   *

The Government appealed from the decision in each of these cases to the Circuit Court of Appeals for the Ninth Circuit. Before hearing the cases were duly removed to this court and are here heard together.

The importers in both cases contended before the Board of General Appraisers and before the circuit court that the Treasury Department had no authority to prescribe in its regulations that a No. 12 sieve of 24 Stubbs or Birmingham gauge should be used in testing rice for the purpose of ascertaining its dutiable classification, and insisted that a sieve of larger mesh, which it claimed was commercially known as the No. 12 sieve, should be used instead. This contention, however, is not urged here.

The United States contends, amongst other things before us, that the tests made in the circuit court were inadequate to show the proportion of rice which would pass through the regulation sieve because (a) the tests were improperly conducted; (b) the samples tested were insufficient in quantity; (c) the samples had deteriorated.

Before giving attention to these claims it may be well to consider the circumstances under which the official samples of these importations were obtained and preserved.

There is no claim that the customs officers did not have full opportunity to take such samples as were necessary, and no fault or wrongdoing on the part of the importers in the matter of obtaining the samples or the subsequent care thereof is claimed.

Any deterioration of the samples between the time the last test was made and the time of importation was the result of manipulation and transportation thereof while in the custody of the Government, and if the contention be true that, by drying, the size of the whole or broken kernels had decreased, this had happened by the operation of natural causes over which the importers had no control.

It is also to be noted that it appears from the records of the two cases that the customs officials either at Seattle or Port Townsend retained portions of the samples taken from each cargo after having sent to the Board of General Appraisers the samples which were used before it and subsequently in the circuit court.

When these importations were made there was in force a customs regulation providing that United States examiners and other officers having charge of the examination of merchandise or the assessment of duty thereon should retain samples thereof when returning an invoice at a higher rate of duty than the entered rate, or when for any other reason it seemed probable a protest would be filed, which samples were for the use of the board; that if no samples had been retained, collectors should require the importers filing protests to supply within five days thereafter samples of the merchandise covered by the protests,

which samples should be verified by the examining officer and submitted to the board with the protests.   (T. D. 25328.)

From what has already appeared it is plain that the officials concerned in the collection of duty in both these cases took such samples of the merchandise as they deemed necessary to enable proper tests to be made thereof pursuant to law and as they were required by the regulations of the department, and it is clear that these samples which were submitted to the Board of General Appraisers and in due process to the circuit court were portions of the originally selected samples and were believed by the customs officers charged with the duty of procuring proper samples to be fairly representative of the importations.

The learned Assistant Attorney General strenuously insists that these samples which were the basis of the test made by importers' witnesses in the circuit court were as a matter of law inadequate in quantity and character, and that therefore such tests afford no basis for the judgment of that court, and cites many cases to support his contention.

We think an examination of these cases discloses that in each case the objection that the official sample was inadequate was made by the importer.   It may well be that an importer can successfully make this objection, when if made by the Government it will not avail.

The United States is a party litigant here; it has ordained that these importations shall pay duty; it has established an executive department whose officers are charged with the responsibility of securing the payment of these duties; that department has prescribed general regulations governing the taking and preserving of samples of the importation in cases like these; in each of these cases such samples have been taken, preserved, and, in due course, tested and passed upon by the various tribunals, the last of which tests forms the basis of the judgment we are now asked to reverse.

In this connection, it must be borne in mind that the Government has not attempted to impeach the tests of these samples made on March 17, 1909, by importers' witnesses, by showing that the results thereof are incorrect, except in one minor detail which involves the weight of some small paper bags and which we think it is unnecessary to further mention; and also that the customs officers at Seattle or Port Townsend retained samples of these importations, which if they had been produced by the Government might have thrown light on some of the issues in these cases.

The Government's position is that the burden is upon the importers to show that the collector's assessment is incorrect and that there is an abiding presumption in favor of the same which the importers have not overcome, and that therefore the collector's action should be affirmed.

As to the *Tremont* shipment, the assessment of the entire importation at the higher rate is concededly unlawful and incorrect, because both sides agree that some portion of the rice would pass through the prescribed sieve, and it would be strange if a due regard for the law should require us to hold that this presumption in favor of the correctness of the collector's action is so potent as to make lawful that which is unlawful and to treat as correct that which is an error. Such a conclusion contravenes good law and good morals and we decline to . adopt it. In the circuit court no such claim was made by the United States. The Government there contended that the sample of the *Tremont* importation when tested by the board was truly representative of that shipment.

We think in each of these cases the position which the Government now takes as to the alleged impropriety of the test, insufficiency of samples, and deterioration thereof can not be sustained.

Some duty must devolve upon the Government in cases like these. When samples are fairly taken of the importation we think the importers have a right to assume that they will be preserved by the Government and in due and proper time and manner produced to be used in determining the final rights of the parties. The Government should see to it that adequate samples are taken and preserved, and ought not in cases like those at bar to be permitted to repudiate the official samples.

To sustain the burden cast upon him of showing the collector's assessment erroneous it ought not to be incumbent upon an importer to preserve samples of importations for possible future use in litigation in order to meet the possible danger of the Government denying the adequacy of those it has taken and upon the correctness of which in the first instance it has relied. It is manifestly unfair to an importer to require him to furnish, at the peril of being defeated if he does not, samples of an importation which, in the ordinary course of business, has long ago been consumed.

Apparently one very proper purpose of the department's regulations on the subject of samples, to which we have referred, is to meet just such cases as these, and if they have failed here to accomplish their purpose the Government should not complain.

There is an especial claim made as to the *Hyson* cargo to the effect that because the importers claimed in their protest that the samples submitted by the examining officer were not samples of the cargo, to which protest the secretary of the importers made oath, the importers have ever since been estopped from reliance upon said samples.

This is not well founded. The oath to the protest, which was not necessary, can not operate to give it a higher character than if it had not been attached. Whether sworn to or not it was a protest only. This feature of it was abandoned before the hearing in the circuit

court and we can not discover in what respect the Government's case has been prejudiced by this change of base. It did not change the character or purpose of the official samples and apparently the Government is no more embarrassed thereby than are the importers by the attempt of the Government to discredit the samples themselves.

We are of opinion that the judgment of the Circuit Court for the Western District of Washington is warranted by the law and facts and ought not to be reversed.

There is one other consideration in this case which may be referred to. It appears that the sample of the *Hyson* shipment tested in the circuit court weighed only about 11½ ounces and that of the *Tremont* only about 18½ ounces.

There may be some merit in the claim that these samples are too small to be fairly representative of the importations, and were it possible to procure larger samples, or were the Government in position and disposed to submit samples that had not been subjected to the wearing-away processes which it claims help render those under consideration insufficient, we might hesitate to take the course already indicated, but to prevent any possible miscarriage of justice so shape the procedure herein as to allow another test to be made. That, however, does not appear possible.

Under these circumstances, we are of opinion that the principle established in United States *v.* Ranlett (172 U. S., 133) may well be applied here. It there appeared that it was difficult to say exactly what part of the importations was dutiable and what part was entitled to free entry, and that an examination *de novo* of the question was impracticable. The court said, however, that the evidence before it appeared to afford an adequate basis for a conclusion and proceeded to render a judgment that confessedly did not represent the exact proportion of the importation which was dutiable or free, although approximately so.

There is a manifest injustice here in the assessment in the *Tremont* case as stated in the quoted part of the opinion of the circuit court, and which was recognized by the board, and that ought to be corrected.

On the whole, we are satisfied that although there may have been inadequate samples of the importations before the circuit court so that it was hardly able to determine with entire certainty just what proportions of these cargoes were dutiable at the higher rate and what at the lower rate, yet it was able to and did reach judgments which were substantially correct, and we think the ends of justice are best subserved by affirming the same, and they are hereby *affirmed.*

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and DE VRIES, Judges, concur.