(C. D. 162)

J. Milton Hagy Waste Works v. United States

United States Customs Court, Second Division

(Decided May 17, 1939)

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Allerton deC. Tompkins* of counsel) and *Jacob L. Klingaman* for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector* and *Joseph E. Weil*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

KINCHELOE, Judge: At the time of trial the suits listed in schedule A, attached hereto and made a part hereof, were consolidated for trial upon motion of counsel for plaintiff.

The said suits are suits against the United States, arising at the port of Philadelphia, for the refund of certain customs duties alleged to have been improperly exacted on certain importations of old cotton rags from Japan, during the period between March 1933 and June 1936. Duty was levied thereon at the rate of 3 cents per pound under the provisions of paragraph 922 of the Tariff Act of 1930, which reads as follows:

PAR. 922. Rags, including wiping rags, wholly or in chief value of cotton, except rags chiefly used in paper making, 3 cents per pound.

On all of the invoices in question, except those covered by four of the protests, to wit: Protests 764371–G, 764372–G, 768182–G, and 768183–G, the appraiser made his advisory classification to the collector by red-ink notations on the invoices indicating that a certain percentage of the particular shipment covered by the invoice before him consisted of wiping rags and a certain percentage consisted of cotton rags. Plaintiff concedes that the percentage of such shipments which was returned by the appraiser as wiping rags was correctly assessed by the collector at 3 cents per pound under said paragraph 922, and, in such protests, limits its claim for free entry under para-

graph 1750 of said act to the percentage of each shipment or lot which the appraiser returned as cotton rags. As to the four protests hereinabove specified, where there was no division by the appraiser in his return of the merchandise covered thereby, plaintiff claims all of said merchandise to be free of duty under said paragraph 1750.

Paragraph 1750 of the Tariff Act of 1930, so far as pertinent, reads as follows:

PAR. 1750. Rag pulp; paper stock, crude, of every description, including all * * * rags * * * and all other waste not specially provided for, including old gunny cloth, and old gunny bags, used chiefly for paper making, and no longer suitable for bags.

Pursuant to the provisions of section 508 of the Tariff Act of 1930, and within ten days after each of the importations in question, plaintiff made a request for segregation of the merchandise covered thereby for the purpose of ascertaining the quantity of such merchandise which was dutiable and the quantity which, it claimed, was free of duty, whereupon the customs officials corded and sealed 10 per centum of the bales covered by each of the importations involved herein, and marked same with the number of the entry to which they related and sent them to plaintiff's warehouse, where they were segregated by employees of the plaintiff under customs supervision.

In the process of segregation the rags contained in each bale designated for segregation were removed therefrom and placed in three separate piles. In the first pile, or so-called "wiper pile," were placed those rags which the plaintiff and the customs examiner agreed were properly classifiable as wiping rags, and which were so classified by the collector. The second pile, or so-called "doubtful pile," contained those rags which the plaintiff contended should be admitted free of duty as paper stock, under said paragraph 1750. Concerning the rags that were placed in said so-called "doubtful pile," the manager of plaintiff's plant, who was present during the time segregation was made, testified as follows:

X Q. Now, those doubtful weren't segregated as to size or anything were they?—A. They were segregated for pieces of heavy, tattered and torn, rotted pieces; in other words, pieces we couldn't send out to the wiper trade.

X Q. And also various sizes, were they?—A. Various.

X Q. Some large and some small, not very large, but large?—A. Large, with holes and patchings, etc.

The foreman of plaintiff's plant, who also testified that he was present during the segregation of the importations in question, described those rags that were placed in the so-called "doubtful pile," as follows:

Pieces that were heavy, tattered and torn, and rotted pieces, and pieces that would have big holes in it, when we couldn't tell when scrap; and then pieces there would be very rotted-like, would fall right apart in your hands.

The third pile consisted of what was called scrap, and which the said foreman described as follows:

> Little, small pieces, I would say about the size of your hand or something like that, and, then, in each 50-pound bundle there was a string around it, and we would tear that string off; it was very small, and we would throw it in with scrap.

But the segregation made by plaintiff's employees was not entirely accepted by the examiner. Thereafter, and when said employees had completed their segregation as just described, the examiner, who had supervised said segregation, made a further examination of the rags contained in the so-called "doubtful pile" from each of the bales and determined the percentage which he regarded as cotton rags, and upon which he based his advisory classification to the collector. The procedure followed and the result obtained by said official are revealed in the segregation reports filed with the official papers in each of the protests where the appraiser divided his return into wipers and cotton rags.

The counsel for defendant contends that there should have been 100 per centum segregation of the rags in dispute, and that therefore the segregation actually made, and as hereinabove described, is improper. This contention, in our opinion, is without merit. The United States appraiser of merchandise at the port of Philadelphia, where the instant merchandise was entered, testified that the procedure followed in segregating the merchandise in question was pursuant to instructions contained in the Treasury Department's letter 110428 of August 10, 1932, copy of which letter was admitted in evidence herein as Exhibit 1. The said letter, so far as pertinent, reads as follows:

> To the end that the interests of the Government, the importers, and the domestic industry may be fairly safeguarded, the following procedure in regard to the entry, examination, and classification of all importations of cotton rags not clearly entitled in whole to free entry as paper stock under paragraph 1750 of the tariff act, will be adopted immediately at all the ports of entry.
>
> 1. If the shipment is believed to contain any dutiable rags and is entered for consumption, estimated duties shall be deposited on the basis of the total net weight of the importation.
>
> 2. An importer who wishes to make segregation of the importation under the terms of section 508 of the tariff act shall make application therefor in a written communication addressed to the collector of customs or deputy collector of customs in charge at the port of entry. A separate application shall be required for each importation where segregation is requested.
>
> 3. If there is no legal objection to the allowance of segregation, the collector or deputy collector, as the case may be, *will cause not less than one package in every ten of the importation to be designated for examination and segregation.* The designation shall be so made as to insure the examination of representative quantities of each grade of the merchandise imported. If the segregation is to be made at the importer's premises, the packages designated for examination and segregation shall be corded and sealed securely after being weighed and prior to their

removal from customs premises, and the cords and seals shall be removed only in the presence of the Customs officer.

4. The segregation shall be made by the importer or his representative, and the entire operation shall be performed in view of a Customs officer detailed for that purpose. The contents of all the designated packages shall be completely segregated and the portion of each package claimed by the importer to be entitled to free entry shall be reviewed by a Customs appraising officer, who shall carefully examine each portion and require any further segregation or make any disallowance of free and dutiable merchandise in each examined package. If the services of the appraising officer are not immediately available, the portions of the segregated merchandise claimed to be free shall be placed in separate containers and corded and sealed.

5. The appraising officer shall indorse on the invoice filed with the entry a report of his findings, showing separately for each grade of rags the proportion of free and dutiable merchandise, and in liquidating the entry the collector shall assess duties on the basis of the report and the weigher's return of weight. [Italics ours.]

The said customs official further testified that the practice outlined in said exhibit was followed for "more than ten and probably fifteen years" (R. 12); and that it was discontinued only upon the issuance of the ruling of the Commissioner of Customs dated January 13, 1933, published as T. D. 46106, Abstract 4 (63 Treas. Dec. 70), which stated:

Certain cotton rags of a type known as Japanese wipers contain no mingled quantities of paper stock segregable under section 508 of the Tariff Act of 1930.

In the case of *S. Schapiro & Sons* v. *United States*, 24 C. C. P. A. 343, T. D. 48771, the said ruling was held to be without warrant of law and of no binding force, since it did not purport to be based upon incapability of segregation, but attempted to determine, in advance of importation, that segregation was not necessary.

As corroborative of the appraiser's testimony, the chief liquidator and acting deputy collector at the said port of entry stated that, in the tariff classification of and assessment of duty on importations of old cotton rags, it was the usual practice to follow the advisory return of the appraiser according to this segregation of the imported merchandise as noted on the invoices, until the said Departmental ruling, T. D. 46106, Abstract 4, was issued. Hence, it is established of record herein that the procedure followed in segregating 10 per centum of the old cotton rags covered by the importations in question was in accordance with an authorized administrative practice that was discontinued only upon promulgation of said Departmental ruling, which was held to be unlawful by our appellate court in the *Schapiro* case, *supra*. Since it is further established by the record before us that segregation of the instant merchandise was made in accordance with the instructions contained in Exhibit 1, we hold the same to meet the statutory requirements and to be proper for the purposes of this case.

During the course of the trial counsel for the plaintiff offered in evidence 125 official samples of the rags in dispute, which were admitted, over objection of counsel for the defendant, and marked Exhibits 7 to 131, inclusive. But said exhibits do not constitute samples of all the types of merchandise included in the several importations before us. No samples of the rags represented by the items enumerated in schedule B, attached hereto and made a part hereof, were offered, and counsel for the defendant has moved to dismiss the protests covering such merchandise so far as they relate to the items of which no samples were produced.

It was testified by the foreman of plaintiff's plant, that he was present during segregation of the rags in dispute; that at the time of segregation the customs examiner, who supervised such segregation, took samples of the so-called "doubtful piles" of the rags obtained from each of the bales segregated; and that said samples were put in bundles properly identifying each sample and taken to the customhouse. Such testimony is corroborated by that of the examiner's clerk (the examiner, himself, being deceased), who further testified that the said samples remained in customs custody until their admission in evidence in the instant case. But why samples of the merchandise covered by all the protests under consideration were not offered is not disclosed. The testimony is clear, however, that at least 10 per centum of each of the importations or marks involved herein were segregated; and that a sample from the so-called "doubtful pile" of each bale was taken by the examiner at the time of his examination.

In the case of *United States* v. *Seattle Brewing & Malting Co.*, 1 Ct. Cust. Appls. 362, T. D. 31454, our appellate court discussed the responsibility resting with the Government in connection with samples of imported merchandise. In said case the court said:

\* \* \* When samples are fairly taken of the importation we think the importers have a right to assume that they will be preserved by the Government and in due and proper time and manner produced to be used in determining the final rights of the parties. The Government should see to it that adequate samples are taken and preserved, and ought not in cases like those at bar to be permitted to repudiate the official samples.

To sustain the burden cast upon him of showing the collector's assessment erroneous it ought not to be incumbent upon an importer to preserve samples of importations for possible future use in litigation in order to meet the possible danger of the Government denying the adequacy of those it has taken and upon the correctness of which in the first instance it has relied. It is manifestly unfair to an importer to require him to furnish, at the peril of being defeated if he does not, samples of an importation which, in the ordinary course of business, has long ago been consumed.

With equal propriety, that language may be applied to the present case. We are not inclined to deny the plaintiff herein consideration

of the issue presented as to certain of the merchandise included in the instant importations simply because no sample of such merchandise was offered, when it appears that the customs officials retained an official sample at the time of examination and segregation of the merchandise. The production of samples of merchandise in dispute in classification cases is not absolutely essential for the proper determination of issues presented in such cases. Citing *Stern Bros.* v. *United States*, 2 Ct. Cust. Appls. 405, T. D. 32167. In the light of the record before us, we do not regard samples of all the merchandise in question necessary to our conclusion herein. The motion to dismiss the protests listed in said schedule B, so far as they refer to the items of merchandise enumerated therein, is denied, and an exception to said ruling is allowed to defendant.

The question of tariff classification of imported old cotton rags has been before this court and the Court of Customs and Patent Appeals many times. The latest expression on the subject is contained in the decision of our appellate court in the case of *Schapiro & Sons* v. *United States*, 24 C. C. P. A. 343, T. D. 48771, which affirmed this court's decision in the matter of *Schapiro & Sons* v. *United States*, 69 Treas. Dec. 815, T. D. 48305.

The record in the instant case is very cumbersome and prolix. In addition to over 160 exhibits, comprising documentary evidence as well as samples of the merchandise in question, the record, consisting of 815 pages, contains the oral testimony of thirty-one witnesses, nineteen of whom appeared on behalf of the plaintiff, and twelve for the defendant.

Some of the points raised herein have been settled in previous decisions involving the same issue. Therefore, we deem it unnecessary to present in this opinion an analysis of the testimony of all the witnesses and the documentary exhibits in evidence. Suffice it to say that we have carefully read the *entire* record before us and have given careful consideration to all of the statements contained therein.

The contention of defendant that since the rags in dispute are bought as Japanese wiping rags and are sold as such in their original bales, without segregation, they are properly classifiable for tariff purposes as wiping rags, is, in our judgment, not tenable. The testimony introduced along this line does not establish commercial designation under the authorities on the subject. See *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. 146, T. D. 48009. Moreover, it has been held that the use of an adjective before an *eo nomine* designation of a commodity does not, of itself, establish the commercial designation of such commodity. Citing *United States* v. *Hoyt, Shepston & Sciaroni*, 16 Ct. Cust. Appls. 502, T. D. 43236, wherein Philippine mahogany was held not to be mahogany; also,

*United States* v. *Walter*, 4 id. 95, T. D. 33371, which held that "ladder tapes" were not "tapes."

The fact is, and it is fairly established by the record before us, that the importations under consideration contain commingled merchandise, and that such merchandise is readily capable of segregation. We are supported in such finding not only by the action of the appraiser who segregated the merchandise in question, as hereinabove described, but also by the segregation of the samples of the rags in dispute represented by Exhibits 7 to 131, inclusive, as made by witnesses for the plaintiff, and their testimony relative thereto. To a certain extent, some testimony introduced by defendant is corroborative of that offered by plaintiff to the effect that the instant importations consist of commingled merchandise. One of defendant's witnesses testified that Japanese wiping rags are inferior in quality to domestic rags and "there is always a percentage of material in there that wouldn't be acceptable to the domestic trade as a wiping rag." At another point in the same witness' testimony he stated that the purchaser of Japanese wiping rags knows he is receiving wiping rags of various sizes, including a certain percentage of "offgrade and small sized stock."

The only issue raised herein is on the point whether the rags in dispute, or a portion of them, belong to a certain class, to wit, paper stock, and therefore are entitled to free entry, which is purely a question of fact. Citing *Schapiro & Sons* v. *United States*, 24 C. C. P. A. 343, T. D. 48771, which also involved the tariff classification of Japanese cotton rags.

Both parties have placed considerable emphasis on the question of size and its relation to the determination whether a rag is a wiping rag or paper stock. Evidently this is due to the recent decision of the Court of Customs and Patent Appeals in the *Schapiro* case, *supra*, wherein it was held, *on the weight of the evidence in said case*, that all of the imported rags there in question, less than 144 square inches in area were free of duty as paper stock, and all of the other rags were dutiable as assessed by the collector. But said conclusion was based entirely on the record before the court in the cited case. No fixed rule was laid down by the court that the size of a rag was to be accepted as determining the tariff classification thereof, as wiping rags or as paper stock. Size alone is not the determining factor whether a rag is a wiper or not. The size required by a jeweler in his work is certainly not what would satisfy an automobile service station for its purpose.

It appears that the rags in dispute have been washed and bleached, and that the buttons, hooks, and eyes have been removed therefrom. Counsel for the defendant contends that such imported condition of these rags precludes them from consideration as paper stock; that

paper stock rags are always unprocessed; and that the condition of the instant merchandise has brought the same to the state where they are a finished article and dedicated to a particular purpose, to wit, wiping rags, or wipers. Much of the testimony offered by defendant's witnesses was predicated upon the condition of the rags in question. Their conclusions relating to the practicability and adaptability of said merchandise for use as wipers or as paper stock were, in our judgment, largely influenced by the fact that the rags had been processed. Because the rags in dispute had been washed and bleached, and the buttons, hooks, and eyes removed therefrom, does not necessarily exclude such merchandise from tariff classification as paper stock, crude. This same contention, as raised by defendant in the instant case, was before the court in previous cases involving the tariff classification of old cotton rags, as evidenced by the following language of the Court of Customs and Patent Appeals in the *Schapiro* case, *supra:*

The question of the proper classification of rags imported from Japan has recently been before us in the following cases: *National Sanitary Rag Co.* v. *United States,* 23 C. C. P. A. (Customs) 200, T. D. 48051; *United States* v. *Belgam Corp. et al.,* 22 C. C. P. A. (Customs) 402, T. D. 47402; and *Hawley & Letzerich et al.* v. *United States,* 19 C. C. P. A. (Customs) 47, T. D. 44893. In the last two cited cases the rags were processed as were the rags here, but nevertheless we held, in the case of *Hawley & Letzerich et al.* v. *United States, supra,* that the rags there involved, upon the evidence in the record, should have been classified as paper stock, crude, and we reversed the trial court. In the case of *United States* v. *Belgam Corp. et al., supra,* we affirmed the judgment of the trial court holding that the involved rags, upon the record in that case, were classifiable as "paper stock, crude." It is true that both of these cases arose under the Tariff Act of 1922, which did not contain any provision similar to paragraph 922 of the Tariff Act of 1930, but the principle involved there is identical with that here upon the question of whether processed rags such as here involved may be included in the term "paper stock, crude."

In the *Hawley & Letzerich et al.* case, *supra,* the court said:

Emphasis has been placed by the Government upon the fact that the samples of the exhibits show the rags to have been washed and the buttons removed, and it is insisted that paper-stock rags are not imported in this condition but only in an unclean state; that they are not "crude" rags, because they have been washed, sorted, fumigated, sized, and had the buttons, clasps, etc., removed

As for the sizing, that is answered by an inspection of the official samples. The dimensions are so various and different as to negative the contention that they have been sized. As to the other processes, we know of no adjudication by any court holding that these destroy the crudeness of the rags or that putting them in a sanitary condition by fumigation and washing or that removing hooks and buttons destroys their usefulness for paper stock.

The following from our decision in the *Pacific Iron & Metal Co.* case, *supra,* is apropos:

In the case of *United States* v. *Stone & Downer,* 12 Ct. Cust. Appls. 293, T. D. 40296, on authority of cases there cited, we said: "As a general rule, a mere cleansing process the purpose of which is to isolate the article of commerce from impurities, and which does not advance it beyond a clean state or condition,

and which does not affect the article *per se*, cannot be said to be * * *" a manufacturing process in a tariff sense. Likewise, the removal of buttons, hooks, and other foreign matter from a material for the sole purpose of getting the material by itself would not be a manufacturing process. *United States* v. *Michelin Tire Co.*, 1 Ct. Cust. Appls. 518, T. D. 31544.

Following the rulings in the cited authorities, we hold that the processed condition of the rags in dispute does not necessarily exclude them from the provision for "paper stock, crude" in paragraph 1750 of the Tariff Act of 1930.

The question involved herein is, in our judgment, purely one of fact, to wit, whether the rags in dispute, or a portion of them, are of the class that was chiefly used for paper making at the time of the several importations under consideration. What we said in our decision in the case of *Schapiro & Sons* v. *United States*, T. D. 48305, concerning the consideration of the identical issue there involved is equally applicable here. In the cited case we stated:

> In the determination of the questions of fact herein raised the burden is of course on the plaintiffs to show by a fair preponderance of evidence that rags of the kind here in dispute were used chiefly for paper making at or immediately prior to the time of the respective importations. *Wilbur-Ellis Co.* v. *United States*, 18 C. C. P. A. 472, T. D. 44762. And in this connection the particular use made of the instant importations is not the controlling factor. The legal test is the chief use in this country of rags of the same general class and character as the disputed ones, and for this purpose the domestic and the imported rags are to be considered as a whole. G. A. 7194, T. D. 31447 (20 Treas. Dec. 560); *United States* v. *Spreckels*, 17 C. C. P. A. 400, T. D. 43835.

The testimony of plaintiff's witness Schapiro is representative of the testimony introduced on behalf of plaintiff concerning the uses of old cotton rags and the characteristics which adapt such rags to their uses. The said witness testified that he is president and general manager of S. Schapiro & Sons, Inc., dealers in rags and waste paper; that he has been in the rag and paper business for twenty years; that he has been dealing in old cotton rags for that length of time; that the two principal uses for such rags are for wiping purposes and for paper making, any other use being merely minor or incidental; that that has been true since June 17, 1930, and immediately prior thereto, up to the present time; and that he has bought old cotton rags for such uses in wholesale quantities practically all over the United States. He further stated that he is able to determine from an examination of an old cotton rag to which branch of the trade it belongs, and that his ability to do that is based on his experience for—

> over 20 years, in the trade, starting as a sorter and baler of rags, buying and selling them, visiting plants where rags are sorted, and accumulated, up to and including the paper mills and the wiping rag establishments that use our rags.

He further testified that the requirements of a rag for paper stock have remained constant from 1929 up to the present time, and that such requirements are dependent—

on the type of paper being manufactured. In some instances, colored rags were purchased and bleached white in order to make certain grades of paper, and in some instances a white rag would be purchased. Some manufacturers required larger than others, depending upon their labor costs.

Concerning the requirements for wiping rags, the said witness testified as follows:

Q. Now have the requirements of wiping rags in the United States changed from the end of 1929 up to the present time?—A. No, sir.

Q. What are the requirements of such wiping rags, during the period mentioned?—A. The rag must be of sufficient size so that it can be conveniently used in the wiping or polishing of surfaces. It must be absorbent. It must be free of tender material, free of heavily-patched or holed rags.

By Mr. Allerton deC. Tompkins:

Q. Do all of those qualifications enter into every rag?—A. For use in wiping materials, yes; except that there is a question of degree of absorbency, for instance. In other words, some rags in make-up will be more absorbent than others, but all must have absorbent qualities.

Q. Would all rags over 288 square inches, say, be usable for wiping purposes?— A. No, sir.

Q. Would all rags that are absorbent be used for wiping purposes?—A. No, sir.

Q. In other words, is it necessary to have the rag a suitable size, suitable strength, suitable absorbency, and suitable unpatched condition before it becomes a wiper?—A. That is correct.

Q. Has that been true from the end of 1929 up to the present time, in your experience?—A. Yes, sir.

Q. What, according to your experience, has been the chief use for the past eight or nine years of old cotton rags, which are not wipers?—A. Paper stock, paper making.

The said witness further testified that he examined the official samples of the rags in question, which are in evidence as Exhibits 7 to 131, inclusive; and that he found "some of the rags in these samples would be used for wipers and others for paper making." He produced a schedule which, he testified, he prepared during his examination of said exhibits, showing, in terms of percentage, the quantities of rags in each of said exhibits that he regarded as wipers and paper stock. The said schedule was admitted in evidence as Exhibit 145.

The six succeeding witnesses who testified on behalf of plaintiff, all of whom had many years' experience in the rag industry as buyers, sellers, graders, and distributors of old cotton rags, also testified that they examined the said official samples; and that during the course of their respective examinations each one prepared a schedule similar to that produced by the witness Schapiro. Said schedules were admitted in evidence and marked Exhibits 146, 147, 148, 149, 151, and 152. It might be added at this time that, although the said official samples were also available to defendant's witnesses, none of them made such examination or segregation of said exhibits to rebut the results disclosed by the said schedules submitted by plaintiff's witnesses. As

heretofore stated, the testimony of defendant's witnesses, in our opinion, was greatly influenced by the processed condition of the rags in question.

As we view it, the testimony of plaintiff's witnesses shows that the class of old cotton rags chiefly used for wiping purposes embraces those rags which are of sufficient size, of proper absorbent quality, and in good condition, free of heavy patches, holes, etc., to serve the particular use for which intended. Such testimony is substantiated by the specifications for wipers offered in evidence by plaintiff and which are represented by Exhibits 143, 144, 154, 164, and 165. Each of said exhibits refers to the size, quality, and condition of rags necessary for the wiping purpose intended. And, to some extent, there is corroboration of such evidence by defendant's witnesses where they testified that in determining whether a rag is of the class chiefly used for wiping purposes consideration must be given to size and condition.

Counsel for the defendant, in his brief, urges that "the price is the controlling factor which distinguishes wiping rags from paper stock," and "that the higher the price of a given rag, the less likelihood that a paper mill will be able to afford its use, however desirable the rag might be." Price undoubtedly is quite a factor in the use of cotton rags for paper making, and for this purpose almost any sort of cotton rag, whether washed and processed, or not, can be used for paper making, whereas wiping rags, on account of their special adaptability for wiping and polishing purposes generally, command a higher price in the market than is ordinarily paid for paper stock rags, although some manufacturers of a high-class paper may sometimes buy a superior grade of cotton rags and pay a higher price for them than for ordinary paper stock rags. However, the record before us, in our opinion, is fairly conclusive that if a rag possesses the essential elements of size, quality, and condition, necessary for use as a wiper, it is of the class chiefly used for wipers and that all rags without such characteristics are of the class chiefly used for paper making.

On the whole, it is our opinion that the preponderance of evidence before us establishes that there are two predominant uses for the old cotton rags in question, to wit, for wiping purposes and for paper stock, any other use being merely minor or incidental; that at the time of the respective importations a certain percentage of the rags in question was of the class chiefly used for paper making; and that such rags were not at the time of enactment of the Tariff Act of 1930 of the class chiefly used for wiping purposes. The time element considered in connection with the respective uses is consistent with principles laid down by our appellate court in the *Schapiro* case, *supra*.

Since we are satisfied that a percentage of the rags in question is of the class which was chiefly used for paper making at the time of the importations involved herein, our next consideration must neces-

sarily be directed to a determination of that portion of the instant merchandise which is entitled to free entry under the provision in paragraph 1750 of the Tariff Act of 1930 for "paper stock, crude." It having been established that the two principal uses for old cotton rags since the time of enactment of the Tariff Act of 1930, and immediately prior thereto, have been for wiping purposes and as paper stock, and that such rags not used as wipers have been, during the said period, of the class chiefly used for paper making, it is a fair conclusion, in our opinion, that as to those invoices where the appraiser divided his advisory classification into wipers and cotton rags, the portion of said importations indicated as cotton rags represents old cotton rags of the class chiefly used for paper making. An analysis of the schedules showing the results of segregation of the official samples by plaintiff's witnesses, represented by Exhibits 145, 146, 147, 148, 149, 151, and 152, reveals that their results substantiate the findings of the appraiser in those cases. As a matter of fact, the average percentage of rags as ascertained by said witnesses to be of the class chiefly used for paper making exceeds that of the appraiser. But inasmuch as the samples available to the witnesses at the trial merely represented a portion of the bales segregated under customs supervision and upon which the customs officials based their returns, we believe the interests of justice are best subserved in accepting the findings of the customs officials.

We therefore hold as to those protests covering invoices which bear red-ink notations of the appraiser showing a percentage of the importation to consist of wipers and a percentage to be cotton rags that the portion returned as cotton rags is properly entitled to free entry under said paragraph 1750 as paper stock, crude, as alleged by plaintiff.

As to the four remaining protests, to wit, protests 764371–G, 764372–G, 768182–G, and 768183–G, where there was no separation in the advisory returns of the appraiser, we hold the percentages of the rags covered by said protests found by plaintiff's witnesses to be paper stock, as set forth in schedule C, attached hereto and made a part hereof, to be free of duty under said paragraph 1750, as alleged by plaintiff. In arriving at the percentages of paper stock covered by the four protests enumerated in said schedule C, the same method was employed that the appraiser used in his calculations for the returns made on the invoices where he divided the importations into wipers and rags.

During the course of the trial counsel for the defendant moved to dismiss the protests on the ground that plaintiff failed to establish the chief use of the merchandise in question as paper stock, and on the further ground that all of the testimony adduced by plaintiff's

witnesses was based upon samples not representative of the merchandise in dispute. Said counsel also moved to strike from the record Exhibit 165, and the testimony of plaintiff's witness Ahrens. All of said motions are denied and an exception to each of said rulings is allowed counsel for the defendant.

To the extent indicated, the protests are sustained; in all other respects, and as to all other merchandise, the protests are overruled. Judgment will be rendered accordingly.