(C.D. 4008)

LESLIE B. CANION *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 28, 1970)

*Stein & Shostak* (*S. Richard Shostak* and *Arthur E. Schwimmer* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Robert Blanc*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The above enumerated protests, consolidated for purposes of trial and decision, present the question of the proper classification for customs duty purposes of certain merchandise imported from Japan invoiced as "Natural Shells". The merchandise was classified as shells, manufactured, in paragraph 1538 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 15 per centum ad valorem.

The sole claim of plaintiff is that the articles in issue should properly have been classified as shells, unmanufactured, which are provided for in paragraph 1738 of the 1930 Tariff Act and, as such, are entitled to entry free of customs duty.

At the trial plaintiff called two witnesses and introduced into evidence four exhibits. The first of plaintiff's witnesses was Mr. Morris Pepper, president of the Houston Handbag Co., the actual importer, and vice president of Caron, Inc., a successor corporation. This witness explained that his wife started making handbags as a hobby. Houston merchants were attracted to the articles, and what was a hobby became a handbag business. Since 1959 the Houston Handbag Co. has imported various bags and ornaments for bags such as shells and flowers. Mr. Pepper, in addition to taking care of the credit phase of the business, was involved in buying and selling, following up on the delivery of merchandise, and, with the assistance of a customs broker, taking care of any customs problems that arose. In 1961 or 1962 he went to Europe and in 1964 to the Orient to make purchases.

When his attention was directed to the invoices covering the merchandise in issue, described as "Natural Shells" KS–G–5, KS–G–6, KS–G–12, and KS–G–10, Mr. Pepper stated that he was familiar with the merchandise and had seen it upon importation. He testified to his

familiarity also with the item of natural shell merchandise invoiced as KS–11. There is no difference between the merchandise invoiced with or without a "G", except that the KS–11 items, i.e. without a "G", are plain and the items with a "G" are painted a gold color.

On his trips to Italy and other parts of the world, Mr. Pepper had purchased both plain and colored shells. The shell cleaning and coloring processes that he had observed in Italy were described by the witness as follows: When shells are taken out of the sea they are black. The shells are subjected to eight processes to place them in a clean saleable condition. The process that takes place in the first bin results in a removal of the tar. In the second bin, living matter in the shells is killed. The succeeding six steps bring the shells to a marketable condition. The colored shells, however, do not go through these eight steps. On completion of the fifth processing step, the shells are dipped in a vat containing white or silver-appearing paint, or gold, brown or bronze paint. They are then placed on a screen and left in the sun to dry.

Mr. Pepper stated that although he had not seen shells being processed in Japan, he had seen them being processed in the Philippines as well as in Italy. The processing of shells in the Philippines and in Italy was similar.

With his attention directed to the Japanese shells in controversy, the witness stated that they were not engraved, not cut, not ornamented, and that nothing had been done to them other than painting.

According to Mr. Pepper, the use of the shells is the same whether colored or plain, and whether imported from Japan or Italy. None had been imported from the Philippines by plaintiff. That use is to affix them to ladies' handbags for decorative purposes. He stated that such use of the shells was characteristic of the use of all their shells, regardless of size. Furthermore, the fact that the imported KS–G shells were colored, and the KS series of shells were not, did not affect the value of the articles. It is the size and shape of the shells which determine their price.

Mr. Pepper explained that exhibits 1, 2 and 3 were shells imported from Italy and that there were no exhibits available from the shipments in issue or from other importations from Japan. He testified that exhibits 1, 2 and 3, although Italian in origin, were representative of the shells his company imported from Japan at the time that the instant merchandise was brought into this country. He also stated that the condition of the shells in the instant importations from Japan was the same as that of shells imported from Italy. Exhibit 4 consisted of one of plaintiff's handbags with both plain and gold painted shells affixed thereto.

It was stipulated by counsel for the respective parties that plaintiff's counsel had requested the customs officials to produce the official samples of shells taken from the shipments in controversy at the time of importation but that the customs officials were unable to do so.

Mr. Pepper stated that the process of painting the shells imported from Japan differed from the Italian imports in that the former were subjected to spraying whereas the latter were dipped. That was the only difference in the processing of the shells. The shells in issue, whether painted or not, came in clean but not polished, with the edges in their natural state, not smoothed in any way. The shells were not subjected to any further processing before being used in this country as decorations for ladies' handbags.

Mr. James E. Howard, plaintiff's second witness, testified that he is presently a customs inspector at the port of Dallas, Texas. At the time of the importations in controversy, he was the customs examiner who made the advisory classification of the shells.

Mr. Howard testified that the Customs Service took a sample of invoice item KS-G-6 from one of the shipments and a sample of invoice item KS-G-12 from the other shipment, and that both samples were gold painted shells. The KS-11 shells, which to the best of his knowledge were unpainted, were classified free of duty. He testified that the difference in classification between the plain shells and the gold painted shells was based on the application of the paint.

Defendant rests on the presumption of correctness which attaches to the classification of merchandise for duty purposes by customs officials. In its brief, defendant seeks to minimize the weight to be attributed to Mr. Pepper's testimony because he had not observed the processing to which the shells in controversy were subjected in Japan.

It is well settled, of course, that it falls to the party who is protesting a classification not only to overcome the presumption of correctness of the customs officer's action, but also to prove the correctness of the claimed classification. *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, C.A.D. 935 (1968). It is also true that although a preponderance of credible evidence is necessary to overcome the presumption of correctness of the customs officer's classification, the plaintiff is not bound to make out his case to a moral certainty and beyond a reasonable doubt. Furthermore "[n]o higher degree of proof is required when * * * [plaintiff] claims classification of the goods under a duty free paragraph." *A. Millner Co.* v. *United States*, 46 CCPA 97, C.A.D. 706 (1959), and cases cited therein.

On the record presented in this case, the court finds that the plaintiff has borne the dual burden incumbent upon him.

Although plaintiff's witness, Mr. Pepper, did not see the manner in which the instant shells were processed in Japan at or about the time of the present importations, he had witnessed processing of like shells in Italy and in the Philippines. Samples of such Italian shells were received in evidence and Mr. Pepper's clear and unequivocal testimony stands unrebutted that the merchandise at bar is similar. Moreover, there is a stipulation of record to the effect that plaintiff had endeavored to obtain the official samples of the shells in controversy taken by the customs officials from the instant shipments at the time of importation. The officials were unable to produce the samples. Although differing on the facts and issues presented, the following statements from the case of *United States* v. *Seattle Brewing & Malting Co.*, 1 Ct. Cust. Appls. 362, T.D. 31454 (1911), are pertinent:

"To sustain the burden cast upon him of showing the collector's assessment erroneous it ought not to be incumbent upon an importer to preserve samples of importations for possible future use in litigation in order to meet the possible danger of the Government denying the adequacy of those it has taken and upon the correctness of which in the first instance it has relied. It is manifestly unfair to an importer to require him to furnish, at the peril of being defeated if he does not, samples of an importation which, in the ordinary course of business, has long ago been consumed." 1 Ct. Cust. Appls. at 368.

There is set forth below, for ready reference, the competing provisions of the Tariff Act of 1930, or as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, *supra:*

Paragraph 1538, as classified:

"Shells and pieces of shells, engraved, cut, ornamented, or otherwise manufactured_____ 15% ad val."

Paragraph 1738, as claimed:

"shells, not sawed, cut, flaked, polished, or otherwise manufactured, or advanced in value from the natural state. [Free]"

The official record indicates, and Mr. Howard so testified, that the KS–11 shells were permitted entry free of duty pursuant to the provisions of paragraph 1738 of the Tariff Act of 1930 as shells, not sawed, cut, flaked, polished, or otherwise manufactured, or advanced in value from the natural state. The testimonial record also discloses that the only difference between the KS–11 shells and the shells in controversy is that the former were not colored whereas the latter were sprayed with gold paint. It would appear, therefore, to be undisputed

that the shells in issue were not engraved, cut, ornamented, sawed, flaked, or polished. Consequently, the question presented is whether the shells in controversy, by virtue of having been colored with gold paint, have been "otherwise manufactured, or advanced in value from the natural state."

The Circuit Court of Appeals in *Schoenemann* v. *United States*, 119 Fed. 584 (C.C.A. 3d 1903), in construing the language "or otherwise manufactured, or advanced in value from the natural state" in a case involving paragraph 635 of the Tariff Act of 1897 (predecessor paragraph and identical in language to paragraph 1738 of the Tariff Act of 1930 involved herein) gave the following expression of its views:

> "Furthermore, we think that the words "or advanced in value from the natural state," must be read with "or otherwise manufactured," not disjunctively, but so as to join the general concept of the latter phrase with that of the former."

That construction of the language has been carried forward over the years in customs litigation and in intervening tariff acts, and was applied in the case of *United States* v. *Colonial Bead Co., Inc.*, 36 CCPA 78, C.A.D. 401 (1949).

Other cases also have been before this court wherein questions were raised as to the application of the language "or otherwise manufactured, or advanced in value from the natural state". *American Bead Company* v. *United States*, 10 Treas. Dec. 28, T.D. 26585 (1905) ; *Pacific National Bank et al.* v. *United States*, 15 Cust. Ct. 237, Abs. 50357 (1945) ; *Thompson Trading Co.* v. *United States*, 22 Cust. Ct. 297, Abs. 53093 (1949) ; *August Bentkamp* v. *United States*, 40 CCPA 70, C.A.D. 500 (1952), *inter alia*. The *Colonial Bead* case, however, upon which plaintiff relies, is particularly in point. The following description of the merchandise therein is taken from the court's decision:

> "It appears that appellee imported at the port of New York from Nassau, British West Indies, a quantity of small sharply pointed marine shells ranging in length from about ¼ inch to about ¾ of an inch. The shells after having been gathered were immersed in a chemical solution which cleanses the shells, destroying any living matter that may be in them. They have rough holes near their open ends and were strung on pieces of ordinary cotton string. A sample of the involved imported merchandise about 30 inches long is an exhibit in the case. The holes were punched with an awl or needle. Some of the shells were dyed, while the others are in a kind of ivory white natural color. There is no difference in price between the dyed shells and the others, and it is said that the shells are strung so that they may be sold by linear measurement. It appears that the same kind of shells may

be purchased in bulk and unpunched, and are sold by weight or volume. They are used in manufacturing novelties and costume jewelry by pasting. The punched and strung shells cost more for the same quantity than the others. The strings are always removed from the shells after importation. When used in the making of necklaces, ornaments, and the like, they are restrung or sewed to a base, use being made of the punched holes." 36 CCPA at 79–80.

In the *Colonial Bead* case the Court of Customs and Patent Appeals followed the cases of *Schoenemann* and *American Bead Company supra*, and the apparent legislative approval of the judicial interpretation therein contained by the reenactment of identical language in subsequent tariff acts. Hence, the court held that the punching and stringing of the shells therein were not manufacturing operations which advanced the articles in value from their natural state. As to the shells that had been dyed, the court stated:

"Since the dyeing of some of the shells does not give them any difference in value from the undyed shells, the dyed shells must be considered in the same light as similar shells not dyed."

The Government in the instant case attempts to distinguish the *Colonial Bead* case on the ground that the shells there in controversy were dyed rather than sprayed. The court does not consider this distinction to be one of substance. In the case at bar it has been shown that the value of the shells is predicated on the size and shape of the shells and not on whether they are colored or plain.

The cases of *United States* v. *Gage Bros. & Co.*, 8 Ct. Cust. Appls. 306, T.D. 37584 (1918), and *Keer Maurer Company* v. *United States*, 32 Cust Ct. 28, C.D. 1576 (1954), referred to by defendant in its brief, involve the construction of statutory provisions different from those in issue, and have no controlling effect on the instant case.

Applying the rationale of decision in the *Colonial Bead* case to the present one, and upon the record here presented, the court holds that the spraying with paint of the articles in issue was not a manufacturing operation which advanced the articles in value from their natural state. Hence the shells in controversy are not shells, manufactured, within the purview of paragraph 1538, as classified.

Plaintiff's claim for classification of the shells in controversy as shells, not manufactured or advanced in value from the natural state, in paragraph 1738 of the Tariff Act of 1930, which are entitled to entry free of customs duty, is sustained.

Judgment will issue accordingly.